### COMMONWEALTH vs. ESSEX COMPANY.

The Essex Company, having made and maintained a fishway in their dam across the Mer-
rimac River, to the satisfaction of the county commissioners, as required by their
charter, (*St.* 1845, *c.* 163,) and having duly accepted the act of 1848, *c.* 295, authorizing
them to increase their capital stock on condition that they should be liable for all dam-
ages occasioned by their dam to the owners of fish rights above it, and having paid
large sums of money for such damages, cannot afterwards be required by the legislature,
in the exercise of their power to regulate fisheries, to make different fishways; notwith-
standing the Rev. Sts. *c.* 44, § 23, reserving to the legislature the right to amend, alter
or repeal charters.

INDICTMENT against the Essex Company on the *St.* of 1856,
*c.* 289, for neglecting to make and maintain around their dam
across the Merrimac River at Lawrence a suitable and suffi-
cient fishway for the usual and unobstructed passage of fish.
Trial in the court of common pleas in Middlesex, before *Aiken*, J.,
who signed this bill of exceptions :

" To sustain the indictment, the Commonwealth offered proof
that the defendants have not constructed in or around their dam
at said Lawrence fishways which admit of the usual and unob-
structed passage of fish, as alleged in the indictment. To the
admission of this evidence the defendants objected, as incom-
petent and immaterial. But it was admitted, subject to objec
tion.

" The defendants then offered to prove the following facts
That the said Essex Company, on the 16th of August 1847,
made application to the county commissioners for the county
of Essex, requesting them, after due notice and a hearing of all
parties interested, to prescribe the mode in which they should
construct fishways in their said dam at Lawrence, according to
the seventh section of their act of incorporation, *St.* 1845, *c.* 163 ;
that thereupon the said county commissioners appointed the
20th of September 1847, and the town of Lawrence, as the
time and place for said hearing, and ordered said company to
give notice thereof to all persons and corporations interested
therein, by publishing an attested copy of said petition and
order thereon in every newspaper published in the towns in

Middlesex and Essex counties bordering on the Merrimac River, three weeks successively, the last publication to be seven days at least before said September 24th, and also by serving an attested copy of the same on the town clerk of every town in said counties bordering on the Merrimac River, and also by posting up an attested copy thereof in two public places in each of said towns fourteen days at least before said September 24th ; that said order was complied with ; that on said September 24th 1847 the said commissioners had a public hearing of all parties interested, that said hearing was largely attended, that the respective parties were represented by counsel, and that about twenty witnesses were examined ; that, after consideration, the said commissioners subsequently, namely, on the 12th of October 1847, did prescribe the mode in which the said company should construct fishways in their dam, and the same was duly made matter of record ; that immediately thereupon the said company did construct fishways in their dam according to the prescription of said commissioners, and to their satisfaction as having been built according to their prescription, and have maintained the same during the period mentioned in the indictment, and that no complaint has ever been made to the commissioners of Essex county that said fishways do not conform to said prescription.

" That immediately upon the passage of the act of 1848, c. 295, the Essex Company accepted the same as therein prescribed, increasing their capital stock by the additional sum of $500,000 as therein provided ; that, at the passage of said act, the character of said fishways, as not affording a usual and unobstructed passage to fish, was well known, and was brought to the notice of the legislature ; that, immediately after the passage of said act, the Essex Company paid, under said act, the sum of about $26,000 to the owners of fish rights above said dam, as damages for hindering or impeding the passage of fish by their said dam with the fishways aforesaid.

" That the Essex Company own, by purchase, the land at and around each end of their dam ; that a fishway, securing the usual and unobstructed passage of fish in or around said

dam, will cost, as variously estimated from $10,000 to $40,000 ; and that the number of stockholders in said company in the years 1847 and 1848 was about two hundred and fifty, and in 1856 was about three hundred and fifty.

" The Commonwealth objected to the admission of this evidence, on the ground that it was incompetent, and, if admitted, would furnish no legal defence to said indictment. The court ruled that said evidence was incompetent, and that said facts, if proved, would constitute no legal defence to the indictment, and excluded the evidence.

" The defendants offering no further evidence, the court instructed the jury that upon the evidence the Commonwealth was entitled to a verdict, and under this the jury accordingly returned a verdict of guilty. To the admission of the evidence aforesaid introduced by the Commonwealth, and to the rejection of said evidence offered by the defendants, and to the rulings and instructions aforesaid, the defendants excepted."

This case was argued at Cambridge at October term 1858.

*R. Choate & E. Merwin,* for the defendants.

*S. H. Phillips,* (Attorney General,) for the Commonwealth The provision of *St.* 1856, *c.* 289, § 1, that the Essex Company should, before the 1st of February 1857, " make and forever thereafter maintain in or around their dam in Lawrence a suitable and sufficient fishway for the usual and unobstructed passage of fish " during five months in the year, was within the constitutional power of the legislature, in the exercise of its superintending care over the fisheries in rivers not navigable ; and prescribed no different duty from that imposed upon the company by their charter (*St.* 1845, *c.* 163, § 5) to " make and maintain suitable and reasonable fishways, to be kept open at such seasons as are necessary and usual for the passage of fish." *Commonwealth* v. *Chapin,* 5 Pick. 202. *Commonwealth* v. *Alger,* 7 Cush. 98. *Stoughton* v. *Baker,* 4 Mass. 524. *Briggs* v. *Murdock,* 13 Pick. 305. *Sts.* 1709, *c.* 3 ; 1741, *cc.* 6, 7 ; 1743, *c.* 5 ; 1745, *c.* 2 — Mass. Perp. Laws, (ed. 1759,) 162, 297, 298, 313, 320. *Sts.* 1749, *c.* 4 ; 1765, *c.* 4 — Mass. Temp. Laws, (ed. 1763,) 67, 235. *Sts.* 1780, *c.* 16, §§ 2, 3; 1783, *c.* 4; 1786, *c.* 11; 1789,

*cc.* 5, 8; *c.* 51, § 3; 1790, *c.* 8; 1791, *c.* 30; 1792, *c.* 10; *c.* 62 § 4; *cc.* 78, 88; 1802, *c.* 51; 1803, *c.* 158; 1804, *c.* 134; 1806 *c.* 28; 1811, *c.* 175, § 4; 1819, *c.* 20, § 1; 1846, *c.* 192.

The *St.* of 1848, *c.* 295, gives the company no new right against the public or owners of fish rights above the dam, and cannot be so enlarged by implication as to release the defendants from their obligation to maintain fishways. *Cleaveland* v. *Norton,* 6 Cush. 383. *Vinton* v. *Welsh,* 9 Pick. 92.

If the *St.* of 1856, *c.* 289, imposes a new obligation upon the company, or makes more onerous an existing duty, it is within the power reserved to the legislature by the Rev. Sts. *c.* 44, § 23, by which every act of incorporation passed since the 11th of March 1831 " shall at all times be subject to amendment, alteration or repeal at the pleasure of the legislature." *Crease* v *Babcock,* 23 Pick. 342. *Erie & Northeast Railroad* v. *Casey* 26 Penn. State R. 305. *Commonwealth* v. *Erie & Northeast Railroad,* 27 Penn. State R. 351. *McLaren* v. *Pennington,* 1 Paige, 108.

New and onerous duties, imposed on various corporations by the legislature, serve to illustrate and confirm this. *Sts.* 1853, *c.* 113; *c.* 121; 1851, *c.* 252; 1850, *c.* 308; 1840, *c.* 85; 1841, *c.* 125; 1842, *c.* 22; 1845, *c.* 191; 1849, *cc.* 191, 222; 1854, *c.* 23; 1857, *c.* 291; 1846, *c.* 82. *Roxbury* v. *Boston & Providence Railroad,* 6 Cush. 424. *Massachusetts General Hospital* v. *State Mutual Life Ass. Co.* 4 Gray, 234.

The case of *Commonwealth* v. *New Bedford Bridge,* 2 Gray, 339, is distinguished in principle from this case by the fact, that the charter to the defendants in that case was granted a long time previous to 1831.

This is not a taking of private property for public use. It is rather a modification of the use allowed by law, or the restraining of a certain use which would be beneficial, for the public good; which is not a taking, within the meaning of the constitutional prohibition. *Commonwealth* v. *Tewksbury,* 11 Met. 55. *Stoughton* v. *Baker,* 4 Mass. 524. *Commonwealth* v. *Alger,* 7 Cush. 98. *Suydam* v. *Moore,* 8 Barb. 358.

Section 23 of the Rev. Sts. *c.* 44 is not in contravention of

the Constitution of the United States, as a law impairing the obligation of contracts.  *Crease* v. *Babcock*, 23 Pick. 340. *McLaren* v. *Pennington*, 1 Paige, 108.  It is valid on the same ground that state insolvent laws operating *in futuro* are valid — that all contracts made while they are in force are expressly made subject to them.  *Ogden* v. *Saunders*, 12 Wheat. 213. *Scribner* v. *Fisher*, 2 Gray, 43.

SHAW, C. J.  The Essex Company, the defendants in this case, were indicted in the court of common pleas for a violation of the *St.* of 1856, *c.* 289, requiring that company, before the 1st of February 1857, to make, and forever thereafter maintain, in or around their dam in Lawrence, a suitable and sufficient fishway for the usual and unobstructed passage of fish, under a penalty of not less than $100 nor more than $500 a day for the time they should neglect to make and maintain such fishway after said 1st of February.  This act was passed on the 6th of June 1856.

The company, having failed to provide any new fishway after the passage of this act, were indicted for such neglect; and upon trial several grounds of defence were taken, which are set forth in the bill of exceptions.  As the several questions substantially resolve themselves into one general consideration of the rights of this company, instead of considering the admissions and rejections of the evidence, and the particular rulings of the court thereon, in detail, it may be more convenient to state the real ground of controversy.

The Essex Company were created a corporation by *St.* 1845, *c.* 163, for the purpose of constructing a dam across Merrimac River, and constructing one or more locks and canals in connection with said dam, for the purpose of creating a water power to use or sell, or lease to other persons or corporations to use, for manufacturing and mechanical purposes, and for constructing a main canal, for navigation or transports.  By § 5, the said corporation was required to make and maintain, in the dam so built by them across said river, suitable and reasonable fishways, to be kept open at such seasons as are necessary and usual for the passage of fish.  By § 7, they were required to

build such fishways in the mode prescribed by the county com-
missioners, after due notice and a public hearing of all parties
interested, with power to the commissioners to examine and de
termine whether the fishways have been built according to such
mode prescribed, and, if so, to accept the same.

By an additional act passed in May 1848, the company were
authorized to increase their capital stock, but upon an express
condition.   *St.* 1848, *c.* 295.   This condition was, "that said
company shall be liable for all damages which shall be occa-
sioned to the owners of fish rights existing above the said com-
pany's dam, by the stopping or impeding the passage of fish
up and down the Merrimac River by the said dam."   An ade-
quate and constitutional mode of assessing these damages was
provided by the act, which of course would not be resorted
to when such damages should be agreed upon by the owners
of such fish rights and the company, and paid.   This act con-
tained a further proviso, that nothing contained in the 7th sec-
tion of the act of incorporation — the section requiring the
company to make and maintain fishways — should be deemed
to be a bar to such claim for damages.   A second section
of this act of 1848 provided that the act should take effect
whenever the stockholders, at a legal meeting, should accept the
provisions of the preceding section, and file an authenticated
copy of their vote of acceptance in the office of the secretary
of the Commonwealth.   It is conceded that such a vote, accept-
ing this act, was duly passed, and an authenticated copy of it
filed with the secretary of the Commonwealth soon after the
passage of the act.   The construction of this statute and the
acts done under it by the defendant company will be considered
hereafter.

By the above statutes the obligation of the company in pre-
serving the fishway on the Merrimac River, as a consideration
and condition of the franchise granted them, was fixed and deter-
mined, until the passage of the act eight years after, *St.* 1856,
*c.* 289, by which the company were required to make and forever
thereafter maintain in or around their dam in Lawrence, a suit-
able and sufficient fishway for the usual and unobstructed pas-

sage of fish, during the months of April, May, June, September and October, in every year.

This is the statute upon which this indictment is found, and the question is, whether the company are liable for the heavy penalties therein declared, for neglect of the duty thus prescribed.

In order to ascertain what was done by the company under their act of incorporation, and the additional act above cited, we recur to the bill of exceptions. At the trial the defendants offered to prove, that after the grant of their charter, and whilst their dam was in process of erection, they applied to the county commissioners, who, after ample public notice, and a full hearing of all parties interested, on the 12th of October 1847, prescribed the mode in which said company should construct fishways in their dam, and the same was duly made matter of record; and that thereupon the company did construct fishways in their dam, according to the prescription of said commissioners, and to their satisfaction as having been built according to their prescription, and that they have maintained the same during the time mentioned in the indictment.

The defendants also offered to prove that immediately after the passage of the act of 1848, c. 295, they in due form, by a vote recorded, authenticated and transmitted to the secretary of the Commonwealth, accepted the said act, authorizing them to enlarge their capital stock and binding them to pay damages to all proprietors of fish rights above said dam; that at the time of passing said last mentioned act, the character of said fishways, so constructed, as not affording a usual and unobstructed passage to fish, was well known, and was brought to the notice of the legislature; that immediately after the passage of said last act, the defendants paid, under said act, the sum of about $26,000 to various owners of fish rights above said dam, as damage for hindering or impeding the passage of fish by their said dam, with the fishways aforesaid; that a fishway in or around said dam, securing the usual and unobstructed passage of fish would cost, as variously estimated, from $10,000 to $40,000; and that the number of stockholders in said company in 1848

21 *

was about two hundred and fifty, and in 1856 about three hundred and fifty.

This evidence was objected to by the counsel for the prosecution, on the ground that it was incompetent, and, if admitted, would furnish no legal defence; it was so ruled by the court, and the evidence was excluded. The defendants offering no other evidence, the court instructed the jury that upon the evidence the Commonwealth were entitled to a verdict, and accordingly the jury returned a verdict of guilty.

In considering these exceptions, we are to regard the facts, of which proof was thus tendered and rejected, as having the same bearing which they would have had if actually proved.

1. The first question arising upon the construction of these statutes, which must obviously be considered and construed together is, what duty did the statute of 1856 require the defendant company to do ? .

The expression is, to " make and forever maintain in or around their dam a suitable and sufficient fishway for the usual and unobstructed passage of fish." Construed according to the subject matter, we cannot fail to understand that this provision refers to the migratory fish, which pass, every spring, from the ocean up fresh water rivers to their head waters, to cast their spawn. No one conversant with the legislation of Massachusetts, and who has witnessed the constant anxiety of the government for the salmon, shad and alewives, and in regulating the fisheries of them, can doubt the purpose of this requirement. At this time, the fishways prescribed by the original act, and built as directed, had been in operation ; and it appears, by the evidence offered, that after the few first years they had proved insufficient for the purpose. Perhaps it is not too much to presume, from the known natural instinct of these classes of fish to pursue the direct line of the natural current, against all obstacles, that no fishway around the dam would be sufficient. But without any such speculation, the evidence showed that the fishway which they had made and maintained had proved insufficient. Under these circumstances, the law requiring them to make and maintain a sufficient fishway to secure the unobstructed passage

of fish was in effect requiring them to make a new structure, at whatever cost, which at their peril should be sufficient. It appears by the evidence, that the first cost of such a structure would amount to a sum, variously estimated, from $10,000 to $40,000.

2. The next question is, whether, taken in connection with the other statutes above cited, it was competent for the legislature to impose the obligation, and require the performance of the duties prescribed in said statute, under the penalty therein expressed, and whether this indictment can be maintained for the non-performance of it.

It seems to be well settled that the obstruction of the passage of the annual migratory fish through the rivers and streams of the commonwealth, is not an indictable offence at common law. But the right to have these fish pass up rivers and streams to the head waters thereof is a public right, and subject to regulation by the legislature ; though the right to take fish in waters not navigable belongs to the riparian owners of the soil along the shores and banks of such rivers and streams. *Commonwealth* v. *Chapin,* 5 Pick. 199. The liability, therefore, of the defendants to this indictment depends upon the statute.

It is plainly within the province of the legislature to determine and regulate the use of all common and public rights and easements. The rights of navigation on tide waters, and of the use of streams not navigable for boats and rafts, are public, and such rights are subject to regulation. It sometimes happens that the full enjoyment of two public rights would, to some extent, interfere with each other ; as where a highway, turnpike or railroad crosses a navigable or boatable stream. It is then for the legislature to determine which shall yield, and to what extent, and whether wholly, or in part only, to the other ; and such question will ordinarily be determined by the legislature, according to their conviction of the greater preponderance of public necessity and convenience. The most common case is that where each is required to yield in part, as in the case of a bridge over a navigable river, furnished with a draw, to be raised for the passage of vessels, at the expense of the bridge-owners, or by the navigators

desiring to pass it, as the legislature may direct. The bridge causes some impediment to the navigation; the raising of the draw causes some impediment to the land passengers. Sometimes a bridge is authorized without a draw, when the naviga tion is small, as in the case of the bridge over Charles River, between Brighton and Cambridge, and the railroad bridge over Miller's River, between Somerville and Cambridge. Sometimes the legislature have required the bridge-owners to pay a sum to every passing vessel, equal to the damage caused by the impediment. These different provisions serve to illustrate the general principle, that all these public rights are subject to regulation; such regulations will be governed by considerations of their relative value and importance.

The manner in which the public right to free passage of fish up the several rivers and streams has been established and regulated, by the early colonial and provincial laws, as well as by the laws of the Commonwealth, is well established. *Commonwealth* v. *Chapin*, 5 Pick. 199. *Vinton* v. *Welsh*, 9 Pick. 87. In this last case, after citing the case of *Stoughton* v. *Baker*, 4 Mass. 572, and various other cases, Parker, C. J., sums up the result thus: " In the first case cited, it was decided, that the colonial, provincial and constitutional legislatures having exercised the right for the public good, of regulating the fisheries in the several towns, the owners of several fisheries and of dams across rivers, held their property subject to such regulations as the legislature should, from time to time, for the preservation of the fish, prescribe. And that doctrine has been received and acted upon as law, from the time of that decision to the present." 9 Pick. 92.

By the decision in *Stoughton* v. *Baker*, all persons who may build a dam for mill purposes, on a stream annually frequented by fish, do it under an implied obligation to keep open sufficient sluices and fishways for the passage of fish, at the proper season; and further, if a grant is made by the legislature to erect a dam across a river, it is to be construed to be under the same implied condition to keep open fishways, unless such implica tion is excluded by an express provision exempting them.

The same principle is recognized in *Vinton* v. *Welsh*, in deciding that an act incorporating the defendant and others to erect reservoir dams, without any provision for fishways, was not a repeal of former laws requiring them, because there was no clause of express repeal, or expressly exempting them from keeping such fishways.

From this view of the law of Massachusetts, we come to the conclusion, that from the earliest times the right of the public to the passage of fish in rivers, and the private rights of riparian proprietors, incident to and dependent on the public right, have been subject to the regulation of the legislature; and the mode adopted by the legislature, whether by public or private acts, to secure and preserve such rights, has been by requiring, in the erection of dams, such sluices and fishways as would enable these migratory fish, according to their known habits and instincts, to pass from the lower to the higher level of the water, occasioned by such dam, so that, although their passage might be somewhat impeded, it would not be essentially obstructed thereby. This was the only remedy, because no private action would lie for the riparian proprietor, and no indictment at common law for the public injury.

3. We are now to consider what are the true construction and operation of the act of incorporation, by which the defendants were constituted and chartered.

All provisions of statute, made for regulating the fisheries, are intended for the public benefit, and all persons, at their peril, must take notice of them; they are therefore public statutes, and the courts of law will, . *ex officio*, take notice of them. *Burnham* v. *Webster*, 5 Mass. 266. *Commonwealth* v. *M' Curdy*. 5 Mass. 324.

The objects proposed to be accomplished by the defendants were so far public in their nature, and designed to promote the public benefit, that it was quite competent for the legislature to exercise the power of eminent domain, by authorizing them to take private property when necessary, providing modes by which a full compensation therefor should be made. These objects were to establish a great water power for manufacturing

and mechanical purposes, and for improving the navigation of the river by locks and canals. *Boston & Roxbury Mill Dam* v *Newman*, 12 Pick. 467. *Hazen* v. *Essex Co.* 12 Cush. 477, 478, The usual provision was made for the assessment and payment of damages, which is made where private property is authorized to be taken for public use.

The usual provision was also made for the preservation of the rights of fishery, both public and private, which have been made in like cases, by requiring the company to make and maintain fishways in said dam, which should be made to the satisfaction of the county commissioners. We believe it has been usual, in such acts of legislation, to delegate an authority to a committee or commissioners, to see that certain provisions are specifically carried into effect; and we have never known the legality of such delegation of power questioned. In the leading case of *Stoughton* v. *Baker*, before cited, it was held that where a certain portion of the things authorized to be done by a committee of three was done by one, to that extent the power was not well executed.

It appears by the facts that the county commissioners did, in due form, prescribe the mode in which fishways should be made, and they were so made, and afterwards maintained, to the time of finding this indictment, in the mode thus prescribed. Under these circumstances, we are strongly inclined to the opinion that the company had performed the condition on which their charter was granted, and would be free from public prosecution. Whether, if the fishways actually provided had proved wholly unfit and inadequate to their purpose, and other measures could be provided within a reasonable cost, which could be shown to be probably effectual, the legislature could, by further legislation, have required the company to construct such other fishways, we give no opinion, for reasons which will appear in our construction of the additional act.

4. In putting a construction upon the additional act, (*St.* 1848, *c.* 295,) it is important to note the date, and the circumstances under which it was passed. At that time the dam had been in operation some time, with the fishway prescribed, and

proved to be unsuitable or insufficient to accomplish the pro
posed purpose of providing for the passage of the fish.    It
appears that the company required legislative aid to enable
them to increase their capital stock.    It seems that the legisla-
ture seized the opportunity to make a better provision for the
security of the fisheries, than that required in the act of incor·
poration had proved to be.    This they did by a scheme to be
proposed to the · company by way of condition, and acceded to
by them in legal form ; a scheme entirely different from that pro-
posed in the act of incorporation, and different from any which
had been previously adopted in any similar case.

The legislature had the power to regulate the public right, and
diminish it or release it, as the best good of the public, on the
whole, might in their judgment require.    Whether that public
good, expected from the fishery, consisted in affording an addi-
tional article of food to the people, or an employment for labor,
or otherwise, the legislature might well compare this with the
public advantage, in affording increased profitable labor and
means of subsistence, and various benefits, from building up a
large manufacturing town, and decide as the balance of public
benefit should preponderate.    Of this they must judge.    *Boston
& Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1.

But the legislature stood in a more delicate relation towards
the various riparian owners of fish rights above the dam.    The
extinction of the public right to have the fish pass the dam
would deprive these owners of their several fisheries, which
were in effect private property.    Towards them, therefore, the
public stood, in some respects, as trustees, and their beneficial
interests could not honorably be disregarded.    The plan, there-
fore, proposed by this enactment, was to substitute, for the
public right intended to be provided for by the fishways re-
quired, a provision for the payment of damages by the company
to every riparian owner of fishing rights along the river above
said dam, giving them a remedy against the company where
none existed before, for all damages occasioned by the stopping
or impeding the passage of fish up and down the Merrimac
River by the said dam.    It declared that the provision in the

7th section of the former act, requiring the making and maintaining of such fishways as the county commissioners should prescribe, should not be deemed a bar to such private claim for damages; implying that, but for this clause, such provision for fishways would have been a bar to any private claim for damages. It provides an easy and constitutional mode for every such private owner to obtain his damages, to be used, if the same should not be adjusted and paid by agreement, which each such private owner would have a right to make, in respect to his own several interest. It was the substitution of one onerous duty upon the company for another, more equitably and effectually to accomplish the same object.

To preclude all question as to the right of the legislature thus to impose a new obligation upon the company, it was provided that the act should not take effect until it should be in terms accepted at a meeting of stockholders called for that purpose, and authentic evidence thereof filed in the office of the secretary of the Commonwealth, for the information and benefit of all persons concerned, as well those individual riparian owners who might claim their rights under it, as those persons who might afterwards acquire or hold shares in the stock of said company. This appears to us to be the direct meaning and construction of this enactment. It was not a new provision, requiring the better performance of a preëxisting duty ; it was substituting a new species of indemnity to parties, where none in any form existed before, either by an action of tort at common law, or by a claim for damages under any statute.

Under these circumstances, it appears to us, especially after it has been acceded to by the company, and after they have paid a large sum of money in pursuance of it, that this enactment has in it all the elements of a contract, executed by one party and binding on the other.

5. The remaining question is whether the act of 1856 is justified by the provision in the Rev. Sts. *c.* 44, § 23, that acts of incorporation afterwards passed should be subject to amendment, alteration or repeal ? That provision is, that every act of incorporation shall at all times be subject to amendment,

alteration or repeal, at the pleasure of the legislature; provided, that no such act shall be repealed, unless for violation of its charter or other default, when such charter shall contain an express provision limiting the duration of the same.

The power of repeal is limited and qualified, and was so considered in the case of *Crease* v. *Babcock*, 23 Pick. 334.

' Does this come within the power of the legislature to amend or alter? It seems to us that this power must have some limit, though it is difficult to define it. Suppose an authority has been given by law to a railroad corporation to purchase a lot of land for purposes connected with its business; and they purchased such lot from a third party; could the legislature prohibit the company from holding it? If so, in whom should it vest; or could the legislature direct it to revest in the grantor, or escheat to the public; or how otherwise?

Suppose a manufacturing company incorporated is authorized to erect a dam and flow a tract of meadow, and the owners claim gross damages, which are assessed and paid; can the legislature afterwards alter the act of incorporation so as to give to such meadow-owners future annual damages? Perhaps from these extreme cases — for extreme cases are allowable to test a legal principle — the rule to be extracted is this; that where, under power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted.

It appears to us, in the present case, that after the government, acting in behalf of the public, and also of all those riparian owners whose fish rights would be damnified by the defendants' dam, with the fishway as it was, entered into a solemn and formal contract with the defendant company to exempt them from the obligation of making and maintaining a suitable and sufficient fishway, if such were practicable, by indemnifying all parties damnified in their several fisheries, and the defendant company had executed their part of the contract by the payment of a large sum of money, it was not competent for the legislature, without any change of circumstances, under

their authority to amend and alter the charter of the company, to pass a law requiring them to do the acts from which, by the terms of such contract, they had been exempted, and therefore that the said act was null and void, and this indictment founded upon it cannot be maintained.                *Exceptions sustained.*